O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MARIA VIRGEN G.,

Plaintiff,

v.

KILOLO KIJAKAZI, Acting
Commissioner of Social Security,

Defendant.

Case No. 8:21-cv-01139-KES

MEMORANDUM OPINION AND
ORDER

## I.

## BACKGROUND

In August 2013, Plaintiff Maria Virgen. G. ("Plaintiff") applied for Title II Disability Insurance Benefits ("DIB") alleging a disability onset date of June 1, 2012, due to "back injury and arthritis." Administrative Record ("AR") 256-59, 290. Her last date insured ("LDI") was December 31, 2017. AR 20. DIB claimants must establish disability prior to their LDI. See Flaten v. Secretary of Health & Human Servs., 44 F.3d 1453, 1461, n.4 (9th Cir. 1995).

On January 27, 2015, an Administrative Law Judge conducted a hearing at which Plaintiff, who was represented by counsel, appeared and testified along with a vocational expert. AR 60-105. After an unfavorable decision (AR 133-47), Plaintiff sought Appeals Council review in April 2015. AR 209. On July 29,

2016, the Appeals Council remanded the case for consideration of several issues. AR 149-51.

On August 8, 2017, Administrative Law Judge Joseph P. Lisiecki ("the ALJ") conducted a second hearing at which Plaintiff, still represented by counsel, testified along with vocational expert Jean Matildy ("VE Matildy").  AR 33-59. On November 17, 2017, the ALJ issued a second unfavorable decision.  AR 18-32. The ALJ found that Plaintiff suffered from the severe, medically determinable impairments ("MDIs") of "bilateral carpal tunnel syndrome; degenerative disc disease of cervical and lumbar spine; degenerative tendinitis and osteoarthritis of bilateral shoulders; seronegative rheumatoid arthritis; inflammatory arthritis; fibromyalgia; and obesity."  AR 21.  The ALJ found that despite Plaintiff's MDIs, she had the residual functional capacity ("RFC") to perform light work with the following additional restrictions:

> [T]he claimant can occasionally lift and carry 20 pounds and 10
> pounds frequently; stand and walk with normal breaks for a total of 6
> of 8-hours workday; sit with normal breaks for a total of 6 of 8-hour
> day; all occasional postural limitations, but no crawling, climbing
> ladder, rope, or scaffolds; no unprotected heights or moving
> dangerous machinery; occasional bilateral reaching overhead and all
> other directions, fine manipulation, feeling, and pushing and pulling;
> and no concentrated exposure to humidity, wetness, dusts, odors,
> fumes, pulmonary irritants, extreme cold and heat, or vibration.

AR 22.

Based on this RFC, VE Matildy's testimony, and other evidence, the ALJ found that Plaintiff could not perform her past relevant work as a warehouse worker (AR 26; see AR 2815-16), but she could work as an office helper.  AR 26-27.  The ALJ concluded that Plaintiff was not disabled from June 1, 2012 through

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

November 17, 2017.  AR 27.

After the Appeals Council denied review (AR 1-8), Plaintiff appealed the ALJ's November 17, 2017 decision.  See Maria Virgen G. v. Commissioner of Social Security Administration, Case No.8:18-cv-02116-KES ("Case I").  On appeal, the parties stipulated to a voluntary remand so that the ALJ could explain the weight given to the opinion of Andrew Jarminski, M.D.  (Case I, Dkt. 18; AR 2545-46).  The case was remanded pursuant to the stipulation.  (Case I, Dkt. 19-20; AR 2544; see AR 2562-66 [Appeals Council's Order remanding case to the ALJ]).

On March 25, 2021, the ALJ conducted a third hearing at which Plaintiff, who was again represented by counsel, appeared telephonically and testified along with vocational expert Mercedes Seraphim ("VE").  AR 2485-98.  On April 26, 2021, the ALJ issued another unfavorable decision.  AR 2452-76.[1]  The ALJ found that Plaintiff suffered from the same MDIs during the relevant period.  AR 2455. The ALJ determined Plaintiff could do light work with the same limitations, except that Plaintiff could "frequently" (rather than "occasionally") use her bilateral upper extremities.  Compare AR 2458-59 and AR 22.  Based on this RFC, the VE's testimony, and other evidence, the ALJ found that Plaintiff could not perform her past relevant work as a stores laborer (AR 2473), but that she could work as an office helper, electronics worker, and routing clerk (AR 2474-75), all jobs that require "frequent" reaching and handling.  See Dictionary of Occupational Titles ("DOT") 239.567-010, 726.687-010, and 222.687-022.  The ALJ concluded that Plaintiff was not disabled from June 1, 2012 through December 31, 2017 (her LDI).  AR 2475.[2]

---

[1] The Court Transcript Index at the beginning of the AR incorrectly states that the ALJ's decision was dated April 26, 2021.  (Dkt. 15-2 at 4).

[2] Since Petitioner did not file written exceptions to the ALJ's April 26, 2021 decision and the Appeals Council did not assume jurisdiction of the case, the ALJ's April 26, 2021 decision is the final decision of the Commissioner.  See 20

## II.

### ISSUES PRESENTED

Issue One:  Whether the ALJ properly considered the opinions of Dr, Jarminski.  (Dkt. 18, Joint Stipulation ["JS"] at 2-5, 8-11.)

Issue Two:  Whether the ALJ properly considered the opinions of Joseph Mann, M.D.  (Id. at 2, 11-13, 15-17.)

Issue Three:  Whether the ALJ properly considered the opinions of treating rheumatologist, Dawn Hnat, M.D.  (Id. at 2, 17-23, 28-30.)

Issue Four:  Whether the ALJ properly considered the opinions of John Dorsey, M.D.  (Id. at 3, 30-33, 36-37.)

Issue Five:  Whether the ALJ properly considered Plaintiff's subjective symptom testimony.  (Id. at 3, 37-45, 49-50.)

Issue Six-A:  Whether the ALJ's findings concerning the RFC of Plaintiff's upper extremities (that Plaintiff can frequently "reach overhead, reach in all other directions, handle, finger, feel, and push/pull with the bilateral upper extremities" [AR 2459]) are supported by substantial evidence.  (Id. at 3, 50-51, 53-54.)

Issue Six-B:  Whether the ALJ erred by failing to discuss the opinion of Nick K. Sharma, M.D.  (Id. at 51, 53-54.)

### III.

### SUMMARY OF THE EVIDENCE

#### A.  **2012.**

Plaintiff told the Social Security Administration ("SSA") that she completed the seventh grade and worked at a factory warehouse from 1988 until June 2012. AR 291.  At that job, she lifted more than 50 pounds frequently, did not use technical skills, and did not supervise people.  AR 292; compare AR 51 (at the August 2017 hearing, Plaintiff testified she worked at a nonprofit organization

---

C.F.R. §§ 404.984(a), (c); see also Dkt. 23.

warehouse where she packed, unpacked, and did computer work), 68, 70-71 (at the January 2015 hearing, Plaintiff testified that she completed college in Mexico and lifted at most 40 pounds at her last job),  972-74 (on 1/23/14, Plaintiff told Dr. Sharma she has a Mexican college degree, worked as a teacher in Mexico, and worked as a "craft coordinator" for the non-profit Concern America, Inc. where she "supervise[d] personnel," operated machines, cutters and computers, and frequently lifted at most 40 pounds).

In April 2012, Plaintiff began doing physical therapy ("PT") through Kaiser Permanente ("Kaiser") for right shoulder pain.  AR 350-51.  An MRI showed rotator cuff tendinosis of the right shoulder.  AR 356.  She received a steroid injection in her right shoulder in May 2012.  AR 356.  She reported chronic lower back pain going back about six years.  AR 359.  She was diagnosed with "mild degenerative disc disease" of the lumbar spine.  AR 359.  She received recommendations for yoga, exercise, and medication.  AR 360-61.

Between August 2011 and June 2012, Plaintiff was diagnosed with seronegative rheumatoid arthritis ("RA") affecting her hand and wrists.  AR 356, 366, 1210.  When her symptoms worsened "with DMRD" [disease-modifying anti-rheumatic drugs], Kaiser rheumatologist Dr. Hnat concluded that her symptoms were more consistent with fibromyalgia.  AR 356, 366, 380, 1210.  Dr. Hnat recommended a trial of sertraline, but Plaintiff took meloxicam, a nonsteroidal anti-inflammatory drug ("NSAID"), instead.  AR 366, 369, 376, 380, 388.  In July 2012, Dr. Hnat recommended a discontinuation of meloxicam and a trial of nabumetone, a NSAID.  AR 380.

At the end of July 2012, Plaintiff, suffering with cold symptoms, told Kaiser she was planning a vacation in Mexico to relax, but she was "afraid she will lose her job."[3]  AR 388.  After returning from Mexico, she continued to exhibit hand

_____

[3] This is after the date Plaintiff told the SSA she had stopped working.  AR

and wrist joint swelling consistent with inflammatory arthritis, and was recommended a trial of Arava (generic name leflunomide), an immunosuppressive drug.  AR 400-01, 444, 468.  By October 2012, she reported "less joint pain and swelling" after taking medication, and she had decreased synovitis in her wrist and hand joints.  AR 444, 465, 467.  However, in November 2012, she reported experiencing flares in her arthritis with wrist/hand joint pain and swelling when doing light housework.  AR 485.  Her daily dose of leflunomide was increased. AR 486.

In September and October 2012, Plaintiff received treatment at Kaiser  for incontinence.  AR 411-14, 427-28, 436-37, 456-57, 473-75, 497-99.  These records do not indicate or reflect that Plaintiff was having trouble walking or using her hands to grip objects.

**B.  2013.**

From January through the beginning of April 2013, Plaintiff's hand/wrist pain and swelling remained unchanged or improved after treatment with leflunomide.  AR 507, 518, 529.  In February 2013, she was recommended a trial of cyclobenzaprine, a muscle relaxant.  AR 519.

In February 2013, Plaintiff, through an attorney referral, first saw chiropractor Michael Barri, D.C., at Tri-Star Medical Group ("Tri-Star"), who became her primary care doctor for her workers' compensation claim.  AR 591, 628, 636, 656, 666, 973.[4]  Dr. Barri described Plaintiff as suffering from lower back and shoulder pain caused by performing her job over the course of many

---

290.  As the ALJ noted, Plaintiff had earnings from Concern America in the third quarter of 2012.  AR 2455, citing AR 264.

[4] That same month, Plaintiff told Dr. Hnat that she had filed a workers' compensation claim for non-arthritic neck, shoulder, and lower back pain that was being treated by other medical sources.  AR 519.

years, as well as hand and wrist pain.  AR 656-57.  Physical examination revealed various mild findings of the cervical spine, lumbar spine, shoulders, upper extremities, and lower extremities.  AR 657-61.  Those findings largely remained unchanged over the course of treatment.[5]

Dr. Barri referred Plaintiff for spinal and shoulder MRIs.  AR 661.  The right and left shoulder MRIs had similar findings, including tendinosis and acromioclavicular osteoarthritis.  AR 719-22; see AR 648.  The lumbar spine MRI showed degenerative disc disease.  AR 723-24; see AR 647-48, 689, 705.  The cervical spine MRI showed disc protrusion at various levels.  AR 725-26; see AR 648, 689, 705.

Plaintiff sought treatment with her workers' compensation providers.  In April 2013, Clifford A. Bernstein, M.D., at Coast Pain Management, administered four trigger-point injections to Plaintiff's back.  AR 929-35.  In May 2013, Dr. Jarminski, an occupational medicine specialist at Tri-Star, recommended electromyography ("EMG") nerve conduction testing, a right shoulder injection, a continuation of  physical therapy and stretching exercises, and prescribed pain medications (Prilosec [generic name omeprazole], tramadol ER, and Cidaflex [generic name glucosamine]).  AR 715-16.  In June 2013, Dr. Jarminski administered a right shoulder injection.  AR 613.  Also in June 2013, Plaintiff told Dr. Barri that acupuncture treatment had helped with her cervical spine and shoulder pain.  AR 867, 873.  Later in June 2013, the EMG testing confirmed that Plaintiff suffered from moderate bilateral Carpal Tunnel Syndrome ("CTS") and mild acute radiculopathy of the left lumbar spine.  AR 617; see AR  689-90, 968.

---

[5] See e.g., AR 648-52 (3/22/13), 711-14 (5/3/13), 702-04 (5/22/13, also reporting generally unremarkable findings in x-rays of the cervical spine and lumbar spine), 869-72 (6/14/13), 695-97 (6/26/13), 687-89 (7/17/13), 677-80 (7/26/13), 667-70 (9/14/13), 768-71 (10/18/13), 790-94 (10/25/13), 786 (11/4/13), 959-62 (12/13/13), 1017-18 (3/3/14).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

In July 2013, orthopedic surgeon Richard Mulvania, M.D., at Tri-Star, recommended lumbar epidural injections but did not recommend surgery for her multilevel cervical spondylosis.  AR 690, 706.[6]  In July 2013, Dr. Jarminski noted that the right shoulder injection had helped "for a couple of months" and that Plaintiff had received shockwave therapy for the lumbar spine.  AR 676, 680; see also AR 666 (reporting in September 2013 that the right shoulder injection provided a temporary benefit).  She was recommended wrist braces and stretching exercises, and was prescribed an additional pain medication (Naproxen, a NSAID).  AR 681-82.  In September 2013, Plaintiff told Dr. Jarminski that the shockwave therapy for the lumbar spine was helpful.  AR 666.  In September and October 2013, Dr. Jarminski administered right shoulder injections.  AR 671, 795; see also AR 790 (reporting in October 2013 that "the right shoulder injection(s) only help for a short period of time"); AR1029 (reporting in June 2014 that right shoulder injections have been beneficial).

Meanwhile, Plaintiff continued to visit Kaiser to treat her hand and wrist pain.  In June 2013, leflunomide was discontinued based on Plaintiff's statement that leflunomide had not been effective.  AR 537.  Later that month, after noting that Plaintiff earlier had a positive skin test for tuberculosis ("TB"), that she had recently had a negative chest x-ray and gamma interferon test, and that she had adverse reactions or no improvement with leflunomide, methotrexate, an immunosuppressive drug, and sulfasalazine, an anti-inflammatory drug, Dr. Hnat recommended hydroxychlorine, which Plaintiff declined.  AR 549.  Plaintiff was recommended a trial of sulindac a NSAID.  AR 550.  In August 2013, Plaintiff's wrist and hand pain remained unchanged even without leflunomide.  AR 574.  That

---

[6] Authorization for the lumbar injections was requested by Manuel G. Rosario, D.O., at Coast Pain Management, in August, September and November 2013.  AR 844-49, 910-22.

month, Plaintiff asked Kaiser for a letter "for work" confirming that she was not contagious with TB.  AR 580.[7]

From September 2013 through August 2014, physical examinations by Dr. Hnat did not reveal any active synovitis.  AR 812 (9/9/13), 834 (11/15/13), 1114 (2/26/14), 1159 (4/23/14), 1188 (8/20/14).

In October 2013, Plaintiff returned to Dr. Barri and continued to complain of right shoulder and lumbar spine pain.  AR 766.  Dr. Barri referred her for spinal Localized Intense Neurostimulation Therapy ("LINT"), and recommended shockwave therapy for the right shoulder and continued acupuncture treatment. AR 766-67, 772.  Shortly thereafter, Plaintiff saw Dr. Jarminski regarding her persistent shoulder and back pain; Plaintiff stated she drops things and breaks glasses because of her CTS.  AR 790.

 In November 2013, Plaintiff saw orthopedic surgeon William Van der Reis, M.D., at Tri-Star, regarding shoulder and wrist pain.  AR 785.  She received a recommendation for one-month night splitting for both wrists.  AR 787.  Later in November 2013, Plaintiff saw orthopedic surgeon Steve Mora, M.D., at Tri-Star, regarding her bilateral hand pain.  Plaintiff reported the worsening of her symptoms and her dropping of objects.  AR 779.  Physical examination of the bilateral hands revealed unremarkable findings. AR 781.  Dr. Mora stated that CTS release surgery on her most painful side (the right hand) was a reasonable course of action.  AR 781-82.

In December 2013, after noting that Plaintiff had been undergoing LINT therapy which Plaintiff found helpful, Dr. Jarminski recommended continued LINT therapy and stretching exercises.  AR 958, 963.

---

[7] Medications that Plaintiff took for latent TB were discontinued in December 2013.  AR 1077.

1

2

### C. **2014.**

In January 2014, Plaintiff had a consultation for CTS release surgery with Dr. Mora. AR 967. Dr. Mora noted "slight diffuse soft tissue swelling," but her hands and wrists displayed no atrophy and she had a full range of motion with "sensory and motor . . . intact." AR 968. Plaintiff reported that she "cannot perform a grip" and "can no longer drive truck," so she wanted to proceed with the surgery.[8] AR 968.

In January 2014, Plaintiff saw orthopedic surgeon Nick K. Sharma, M.D., at Tri-Star. AR 972. Physical examination revealed no tenderness of the shoulders, wrists and hands, a mostly normal range of shoulder motion, a normal range of wrist motion, normal finger motion, normal shoulder, hand and wrist strength, normal grip strength, no atrophy, positive Phalen's and Tinel's tests, "no difficulty" with normal walking but difficulty walking on her toes and heels due to back pain, a reduced range of motion of the lumbar spine, and no knee problems. AR 976-87. Dr. Sharma opined that Plaintiff could work if for her lumbar spine and cervical spine she avoided "heavy work" and if for her CTS she avoided "repetitive use of the hands for pushing, pulling, gripping, or data entry work." AR 990. Dr. Sharma suggested she treat her CTS with "bilateral wrist braces." AR 990; see AR 1095 (CTS "splints" were provided by Kaiser in early January 2014), 1059 (wrist and back braces provided through workers' compensation insurance in March 2014 were "helping"). Dr. Sharma described Plaintiff as "very sketchy as far as her medical history is concerned" and recommended a deposition to pin down relevant facts along with a review of Kaiser's medical records and chiropractic treatment records. AR 989.

---

[8] At the August 2017 hearing, Plaintiff testified that she had a hard time driving her "big truck" because it was "too heavy . . . for my hands" but she could drive her father's "littler car." AR 43. In February 2020, she drove to an orthopedic consultative examination. AR 3997.

Also in January 2014, Plaintiff returned to Dr. Reis for a reevaluation of her hands.  AR 994.  While physical examination revealed positive Phalen's and Tinel's tests, Plaintiff had a normal range of wrist motion, "4+/5" grip strength, and sensation within normal limits.  AR 994-95.  In February 2014, a physical examination at Kaiser revealed  "5/5" hand grip strength.  AR 1104.

In March 2014, Plaintiff saw Dr. Barri.  AR 1014.  Dr. Barri noted that authorization for CTS release surgery and lumbar spine epidurals had been denied.  AR 1014.

On a referral from Dr. Barri, Plaintiff received pain management care from Manuel Rosario, D.O., at Coast Pain Management.  AR 1028, 1035, 1042, 1049.  Physical examinations in January, March, May, and June 2014 revealed normal shoulder and wrist strength.  AR 1031, 1037, 1044, 1051.  While Plaintiff complained of "numbness in both hands" (AR 1029, 1036, 1043, 1050), sensory examinations revealed "adequate" sensation in both upper extremities.  See AR 1031, 1037, 1044, 1051.[9]

From January through June 2014, Plaintiff  saw Dr. Jarminski for her back and shoulder pain.  AR 1057-59, 1067, 1366.  Physical examination in March 2014 revealed full shoulder strength, some reduction in shoulder range of motion, and a full range of hand/wrist movement.  AR 1061-63.  In May 2014, Dr. Jarminski administered lumbar spine epidural injections, which Plaintiff reported were

_____

[9] Other sensory evaluations also had normal or minimal findings.  See AR 1068-69 (1/24/14: 11 of 12 findings within normal limits), 1017 (3/3/14: same), 1060-61 (3/14/2014: same),1198 (8/26/14: sensation is "intact to light touch [bilaterally]"), 1247 (10/6/14: "[l]ight touch intact"), 1452 (11/14/14: finding normal sensation), 1600 (5/1/15: "[s]ensation intact all digits"), 2206 (10/31/16: "sensation is intact to touch"), 2296 (2/22/17: "sensory examination reveals no deficits"), 3115 (1/12/18: "light touch intact Median, Ulnar, Radial distribution"), 3126 (2/21/18: sensation "[g]rossly intact [bilateral upper extremities]"), 3133 (2/6/18: "normal sensation").

effective for 4 to 6 months.  AR 1400, 2129.

In April 2014, Plaintiff told Kaiser that she was worried about taking too many medications and that she has declined to take the medications prescribed by her workers' compensation treating sources.  AR 1146.  In August 2014, Plaintiff complained to Dr. Hnat about hand numbness and loss of grip strength, and stated that "[s]he uses splints [at] night only without improvement."  AR 1187.  Physical examination revealed a positive Tinel's test but no synovitis.  AR 1188.  Dr. Hnat diagnosed her with bilateral CTS and prescribed cyclobenzaprine at bedtime as needed.  AR 1188.  Later in August 1014, Plaintiff was referred for a nerve conduction study.  AR 1197.  Physical examination revealed full bilateral grip strength and a negative Tinel's test.  AR 1198.  The results of the nerve conduction study were that there was evidence suggesting "mild" right and left CTS but no evidence of ulnar sensory or motor neuropathy.  AR 1199, 1206.  She was recommended carpal tunnel wrist splints nightly.  AR 1199.

An MRI of the cervical spine in September 2014 revealed that, due to a bulging disk and posterior element hypertrophy, there was mild to moderate spinal canal narrowing of C4-5, and mild spinal canal narrowing of C3-4, C56, C6-7, and C7-T1.  AR 1234-35.

In October 2014, Plaintiff saw orthopedist Scott Hadley, M.D., at Kaiser.  AR 1246.  Physical examination revealed that Plaintiff's wrists and fingers had a full range of motion, but that Plaintiff's Tinel's and Phalen's tests were positive.  AR 1246-47.  Dr. Hadley indicated that "carpal tunnel release would be beneficial," and Plaintiff opted to proceed with that surgery.  AR 1248.

Later in October 2014, Plaintiff had right hand CTS release surgery.  AR 47, 1366, 1444.  She had post-surgery occupational therapy at Kaiser; she was deemed to have  a good rehabilitation potential and was found to be making "satisfactory progress."  AR 1444, 1466, 1471, 1477, 1483, 1494.  In the middle of  November

2014, she reported, "I am doing much better now with my [right] hand.  I still have a lot of pain though."  AR 1472.  She was given an "edema glove" to reduce swelling.  AR 1472.  She was assessed as follows:  "Excellent gains in mobility noted with hand, improved functional use."  AR 1472; see also AR 1326 (progress note dated 11/17/14 reflected positive findings following the CTS surgery and stated that Plaintiff was "making satisfactory progress").  Later in November 2014, she reported that she "tried to sweep yesterday" and that her "hand is now more tight, painful."  She was assessed with "[m]aking slow progress."  AR 1477.  In early December 2014, she reported wearing her brace because "[i]t keeps me from injuring my hand."  AR 1483.  Although she was "gaining in mobility and strength," she "continue[d] to be very guarded with functional use."  AR 1483.  A week later, she reported that she needed her brace because she had pain when she did not wear it for long periods and that she was "back to driving."  AR 1489.  She was assessed with "making slow gains" and with having a "scar with continued hypersensitivity [and] density."  AR 1489.   In late December 2014, she reported that she was "doing better without the brace" but that the scar was very sensitive.  AR 1503.

In the meantime, in November 2014, Plaintiff complained of lower back pain.  AR 1451.  Physical examination revealed decreased range of motion of the lumbar spine and normal motor skills and strength, but an abnormal straight leg raising ("SLR") test.  AR 1452.  She received pain medication and a recommendation for exercise.  AR 1452.  An MRI revealed degenerative disc disease with some disc bulging, particularly at L5-S1.  AR 1458, 1495.  She received only one session of physical therapy before she stopped going.  AR 1495-97.

**D.  <u>2015.</u>**

In January 2015,  Plaintiff continued to do post-surgery occupational

therapy.  AR 1509.  She reported a sore arm but an improved scar.  AR 1509.
Later that month, she reported "getting better" although she still was not able to
use her right hand to do housework.  AR 1515.  Physical examination revealed
normal mobility of her right wrist and hand but there was continued diminished
strength and sensory compromise.  AR 1516.  In February 2015, she reported not
having much strength.  AR 1531.  She was encouraged to perform home exercises
to improve wrist strength, and was discharged from occupational therapy.  AR
1531.

In January 2015, she returned to Kaiser with intermittent joint pain and
swelling in her hands and wrists.  AR 1522.  She had re-started leflunomide.  AR
1522; see also AR 1537.  In February 2015, she reported continuing wrist pain, but
her right hand range of motion was within normal limits.  AR 1557.  She was
assessed with left CTS that was "mild, controlled with splinting" and with "some
long finger numbness."  AR 1557.  She was given a Velcro left wrist brace and
bilateral elbow pads.  AR 1558.

In March 2015, she discontinued leflunomide to see if it was causing a
persistent cough (it was not) and re-started it in May 2015.  AR 1581, 1591, 1608.
She was still taking it and tolerating it well in July 2015.  AR 1640.

In April 2015, she had increased joint pain and was prescribed nabumetone.
AR 1591.  Toward the middle of May 2015, she reported that nabumetone did not
provide "significant improvement" in her hand and wrist pain.  AR 1608.  In July
2015, nabumetone was discontinued and oxaprozin (brand name Daypro), a
NSAID, was prescribed.  AR 1640.

In early May 2015, she reported right shoulder "pain with internal rotation
and with lifting objects."  AR 1600.  She received another right shoulder injection
because her 2012 injection had "worked well."  AR 1600-01.  She also received a
referral for PT.  AR 1601.

Later in May 2015, she started PT to address her right shoulder pain.  AR 1617-20.  She reported that the injection in her shoulder had not helped.  AR 1617.  Her rehabilitation potential was considered good.  AR 1617, 1625.  She went to PT seven times from May 2015 to September 2015.  AR 1737-38.[10]  In June 2015, her pain was improving but continued when she was resting.  AR 1626-27.   Later in June 2015, she reported that she had more pain with increased activities, but that "she does feel better" with PT.  AR 1633.  Her pain was more localized to the shoulder area.  AR 1634.  In July 2015, she reported feeling better, having no resting pain unless she tried to use her arm or she sat too long, and having pain localized in the lateral shoulder.  AR1674-75.  In early August 2015, she expressed concern about over-using her shoulder and complained of back pain.  AR 1699.  In September 2015, although she reported doing stretches and strengthening exercises daily, she continued to complain of resting pain.  AR 1731-32.  Later in September 2015, Plaintiff reported feeling better after doing her strengthening exercises, but she still experienced pain and some home exercises were too hard.  AR 1739.

Meanwhile, in August 2015, she was tearful and depressed that her chronic pain had not improved.  AR 1706.  She was prescribed an anti-depressant, Zoloft (generic name sertraline), but she declined to see a psychologist due to "financial stress."  AR 1707, 1719, 1721.

By the end of September 2015, her right shoulder pain was worse, and an MRI of her right shoulder was ordered.  AR 1746-47.  The MRI, which was done in December 2015, showed a tear of "anterior fibers of the supraspinatus tendon" and "mild" degenerative changes affecting the acromioclavicular joint.  AR 1750-51, 1772, 1786.

**E.  2016.**

In January 2016, Plaintiff underwent a Qualified Medical Examination

---

[10] Her referral was for twelve sessions of PT.

("QME") for her workers' compensation claim with orthopedic surgeon Joseph Mann, M.D.  AR 1365.  Plaintiff's chief complaint was arm pain.  AR 1365.  Physical examination revealed normal wrist range of motion but reduced right-hand grip strength.  AR 1369, 1436.  Dr. Mann assessed that she had a 1% right shoulder impairment and no wrist impairment.  AR 1411, 1427.  Dr. Mann opined that, although she had some difficulty grasping and lifting, she had "no difficulty" with many activities of daily living.  AR 1431, 1368; compare AR 81-82 (at the January 2015 hearing, Plaintiff testified she got a perm because she "cannot do much" with her hair).  Dr. Mann opined that she could return to work with no restrictions on walking, standing, sitting, bending, kneeling, crawling, twisting, and keyboarding.  AR 1425.  Dr. Mann restricted her from grasping and pushing/pulling more than 2 to 4 hours per day and from lifting/carrying more than 10 pounds at a height of 3 to6 feet for more than 1 hour per day.  AR 1425-26, 1438.

In February 2016, Plaintiff complained of right shoulder pain to Kaiser.  AR 1819.  She stated she was unable to use her right arm without pain and that she had difficulty picking up things.  AR 1820.  Physical examination revealed tenderness over the AC joint and limited range of motion.  AR 1821.  She was offered an injection and PT, but "she states these have not worked well in the past and declined today."  AR 1822.  She was taking Norco as needed for pain.  AR 1829.  Later that month, physical examination by Dr. Hnat revealed tenderness in her hands and wrists.  AR 1830.

In March 2016, Plaintiff had a surgical consultation for potential right shoulder arthroscopy and rotator cuff repair.  AR 1841, 1843.  An MRI of her cervical spine revealed "mild to moderate degenerative changes."  AR 1845, 1858, 1866.  She was recommended to continue neck stretching exercises and was referred to acupuncture.  AR 1858.

16

In May 2016, Plaintiff proceeded with the right shoulder surgery.  AR 1937, 1945-48.  She was referred for post-operative PT.  AR 1942.  She was generally assessed as "doing well" 11 days after surgery.  AR 2005-06; see also AR 1949.  Her rehabilitation potential was "good."  AR 2014.  However, she had trouble tolerating the exercises because she failed to take pain medication, as instructed, before the first five PT visits.  AR 2015, 2021-22, 2031-32, 2037, 2039, 2051, 2053.  She increased her range of motion with PT.  AR 2031-32, 2039, 2053, 2060, 2067, 2096, 2107-08.  She had a gap in PT from July to September 2016 because of lost insurance coverage.  AR 2106, 2113.  When she returned to PT in September 2016, she had "very low pain tolerance," but her range of motion had increased.  AR 2115, 2141.  Her range of motion continued to increase until November 2016.  AR 2148, 2167, 2174, 2181, 2188, 2195, 2246, 2260.  In October 2016, she reported that she had "[c]leaned out her closet and that was too much on her shoulder."  AR 2186.  A week later, her physical therapist wrote, "[s]houlder continues to be overly sore, per pt."  AR 2193.  In November 2016, Plaintiff admitted that she had not been doing the home exercise portion of PT for her shoulder because of back pain.  AR 2244, 2251, 2258.

Meanwhile, Plaintiff continued to take leflunomide for arthritis.  While this medication was paused for her shoulder surgery, it was re-started in July 2016 and had no side effects.  AR 1884, 1886, 2073, 2100, 2153, 2266.

In September 2016, Plaintiff complained to Kaiser of lower back pain which had worsened the past 2 to 3 weeks.  AR 2129.  Lumbar spine x-rays showed mild and minimal degenerative changes.  AR 2123.  Plaintiff was offered oral steroids.  AR 2132.  She reported that she still had Norco leftover from her May shoulder surgery.  AR 2132.

In October 2016, Plaintiff sought treatment in a Kaiser pain management program.  AR 2203.  She reported having lower back pain since 2006 with "flareup

episodes" that typically lasted two weeks, but this time lasted longer; the flareup that started in September was "getting better, but it did not quite go away." AR 2205._She reported that sitting was her best position, and lying down was "not so good." AR 2205._She also reported that she had "Norco which she only takes rarely to help pain control, about 1 to 2 a week." AR 2205.  Physical examination revealed she had an antalgic gait but minimal pain in the lumbar paraspinal area. AR 2206.  She received a lumbar epidural steroid injection.  AR 2206, 2224-25; see also AR 2933 (reporting on 9/25/17 that the injection "helped for 1 month").

**F.  2017.**

In February 2017, Plaintiff underwent an orthopedic consultative examination with Ibrahim M. Yashruti, M.D.  AR 2292.  Plaintiff reported receiving chiropractic treatment and physical therapy for her shoulder which helped "a little."  AR 2292.  Plaintiff reported that she is taking leflunomide, sulindac, sertraline, and amlodipine.  AR 2292  Plaintiff stated that she used a lower back brace intermittently for pain, but she was not wearing it that day.  AR 2292.  Physical examination revealed a normal gait, the ability to toe and heel walk, grossly normal range of motion for the cervical spine, shoulders, wrists and hands, and no sensory deficits, but a slightly below range of motion for the lumbar spine in flexion.  AR 2294-96.

An MRI of the right shoulder in April 2017 revealed mild degenerative changes of the AC joint.  AR 3525-26.  An X-ray of the cervical spine in April 2017 did not reveal any significant abnormalities.  AR 3525.  On that same date, Plaintiff told Kaiser that her "shoulder [was] currently causing minimal issues" and her "pain and disability [were] not felt to be mainly from shoulder."  AR 2309. She received a right shoulder steroid injection.  AR 2310.  In May and July 2017, however, she complained of right shoulder pain.  AR 2326, 2401, 2409.  Physical examination in May 2017 revealed mildly abnormal sitting posture, slightly limited

neck range of motion, normal upper extremity strength except for right-hand grip strength, and a physiologic gait.  AR 2329.  She was referred for acupuncture which was "very helpful."  AR 2331, 2401, 2403; compare AR 3997 (telling consultative examiner in February 2020 that acupuncture provided "little relief").  In July 2017, she received another shoulder injection.  AR 2409.

In July 2017, Plaintiff complained of leg pain to Kaiser.  She reported, "[B]usy at home, stands most of the day[;] [e]levates legs 2-3 times per day, for up to 10 minutes."  AR 2360.  However, less than two weeks later, physical examination revealed a normal gait and "musculoskeletal: normal range of motion" with "no edema."  AR 2377

Also in July 2017, Plaintiff reported that her RA was "generally worse despite leflunomide," and that leflunomide was "causing significant hair loss."  AR 2391.  Leflunomide was discontinued.  AR 50, 2392, 2905 (physical examination on 9/18/27 revealed "[n]o increase in join swelling since stopping leflumnomide").

On August 29, 2017, Plaintiff  presented to Kaiser urgent care after falling the day before and injuring her left shoulder, both legs, and right foot.  AR 2870-71 ("[w]as walking yesterday when she felt her legs give out and slipped down 3 steps"); compare AR 2905 (on 9/18/17, describing fall as caused by "right knee gave way" and complaining that "gait has been affected").  An x-ray of her left shoulder revealed "[n]o acute fracture" "mild" arthritic changes, and an x-ray of her left knee revealed "[n]o acute fracture and "[n]o significant joint disease."  AR 2872.  Although she initially declined to "test gait due to diffuse pain," she had a "stable strong steady gait" upon discharge that same day.  AR 2870, 2872.

Two days later, Plaintiff displayed a "mildly antalgic" gait.  AR 2891.  MRIs of Plaintiff's lumbar spine revealed various abnormal findings leading to an assessment of lumbar disc disorder, lumbar radiculopathy, and chronic low back pain."  AR 2890-91.  She was prescribed a diclofenac sodium gel was prescribed,

and she was recommended a lumbar epidural steroid injection.  AR 2891.

In September 2017, Plaintiff complained of right shoulder pain.  AR 2918. She was treating her pain with acupuncture; an injection about two months earlier had provided two weeks of relief.  AR 2918.  She was counseled to continue acupuncture and her home exercise program.  AR 2919.  A few days later, she received a lumbar epidural steroid injection.  AR 2931, 2935.  Physical examination revealed "no tenderness to palpation" of the lumbar spine and "no pain with lumbar flexion and extension."  AR 2934.

In October 2017, Plaintiff continued to complain of right knee pain following her fall on the stairs about one month earlier.  AR 2962.  She reported using a stationary bike for exercise.  AR 2962.  Physical examination of her right knee revealed "5/5 strength knee flexion and extension without pain."  AR 2963. An x-ray of her right knee did not reveal any abnormalities.  AR 2963.  She was recommended "Tylenol as needed for pain relief" and "NSAIDs as needed on flare-up days."  AR 2963-64.  She was provided knee rehabilitation exercises and was referred for PT.  AR 2964.  At the first PT appointment, she reported limping and using a cane "for [walking] long distances."  AR 2974.  Although she tolerated PT well without pain aggravation (AR 2976), she was discharged after only one visit because she did not return.  AR 2972.

About 10 days later in October 2016, Plaintiff complained of bilateral leg pain, particularly in her anterior shins.  She reported that the sulindac for her hand arthritis did not help her leg pain.  AR 2982.  Physical examination revealed "[d]iffuse tenderness over entire shins and calves bilaterally."  AR 2984.  She was recommended a trial of Effexor, an antidepressant and nerve pain medication, as well as calf and shin stretches.  AR 2985, 2991-94.

In November 2017, Plaintiff agreed to start Enbrel to treat her RA.  AR 3057, 3066.  In December 2017, she reported that her hands were still swollen in

the morning but that "overall pain may be improved" with Enbrel and that she was "[s]till having pain especially at night but now better."  AR 3072-73.  She complained of upper back, neck, and hand pain, particularly right thumb pain.  AR 3074, 3078.  X-rays of her hands showed "moderate arthritic changes" in the five fingers.  AR 3078, 3504-05.  X-rays of the wrists showed mild arthritic changes.  AR 3503-04.  She was referred for PT/occupational therapy.  AR 3075, 3090.  A couple of days later, she complained of right shoulder pain.  AR 3101.  An x-ray of the right shoulder revealed arthritic changes but no other abnormalities.  AR 3102, 3504.

**G.  <u>2018.</u>**

In January 2018, Plaintiff complained of "bilateral hand inflammation and pain increasing over the past few months."  AR 3113.  Regarding her October 2014 right CTS release surgery, she reported, "no further paresthesia, numbness, and tingling.  Pleased with surgery."  AR 3113.  Physical examination revealed full range of motion of the bilateral elbows, wrists and hands.  AR 3115.  She was assessed with having  "no left" CTS and "no role for surgery at this point."  AR 3115.  A few days later, she was recommended shoulder rehabilitation, therapy and acupuncture for her right shoulder anterior scar pain.  AR 3102.

In early February 2018, Plaintiff received occupational therapy for her wrists and right thumb.  AR 3123.  Physical examination revealed that right shoulder range of motion was below functional limits and left shoulder range of motion was within normal limits, and that elbow, wrist, and forearm range of motion was within normal limits.  AR 3125.[14]

In February 2018, Plaintiff sought treatment at Kaiser for dizziness, nausea, and generalized body pains.  AR 3133.  Physical examination revealed that

---

[14] Although Plaintiff was scheduled for six sessions of occupational therapy, the record contains documentation about her attendance at only one session.

Plaintiff's gait was normal and her neck had normal range of motion.  AR 3133.
At that time, she was still taking Enbrel, Effexor, and sulindac.  AR 3135.

In March 2018, about three months after her LDI, Plaintiff began treating
with orthopedic surgeon John Dorsey, M.D., in connection with her ongoing
workers' compensation claim.  AR 3159.  Dr. Dorsey treated Plaintiff from March
2018 to September 2018.  AR 3151-32, 3159, 3169-79.  In March 2018, she was
recommended acupuncture and MRIs of the cervical and lumbar spines.  AR 3159,
3186-93.  In April 2018, she was recommended electrodiagnostic studies of the
upper and lower extremities.  AR 3159.  In May 2018, she was recommended a
cortisone injection of the left shoulder and left elbow, a left elbow brace, and MRIs
of the cervical and lumbar spines.  In September 2018, she complained of neck,
shoulder, left elbow, wrist, hand, and lower back pain.  AR 3160.  Physical
examination revealed that Plaintiff did not make "full effort" with respect to her
grip strength, that range of motion of the left elbow "was full with pain at the limits
of motion," and that she had a normal gait.  AR 3161-63.

In August 2018, a cervical spine MRI revealed "[r]elatively stable appearing
multilevel mild to moderate degenerative changes."  AR 3470-71.

## IV.

## DISCUSSION

The primary issue is whether Plaintiff's MDIs cause as much pain (and thus
as many functional limitations) as she alleges.  The Court, therefore, will address
that issue before turning to the ALJ's evaluation of the medical opinion evidence.

A.   **ISSUE FIVE: Plaintiff's Subjective Symptom Testimony.**

Plaintiff contends that the ALJ erred by failing to give clear and convincing
reasons for discounting Plaintiff's subjective symptom testimony.  (JS at 3, 37-45,
49-50.)

1

## 1.    Relevant Law.

The ALJ engages in a two-step analysis to evaluate a claimant's subjective symptom testimony.  Lingenfelter v. Astrue, 504 F.3d 1028, 1035-36 (9th Cir. 2007).  "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment [that] could reasonably be expected to produce the pain or other symptoms alleged."  Id. at 1036.  If so, the ALJ may not reject a claimant's testimony "simply because there is no showing that the impairment can reasonably produce the degree of symptom alleged."  Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996).

Second, if the claimant meets the first test, the ALJ may discredit the claimant's subjective symptom testimony only by making specific findings that support the conclusion.  Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010); Burrell v. Colvin, 775 F.3d 1133, 1137 (9th Cir. 2014).  Unless an ALJ finds that a claimant is malingering or has failed to provide objective medical evidence in support of his or her testimony, an ALJ must provide clear and convincing reasons for rejecting a claimant's subjective testimony about the severity of experienced symptoms.  Brown-Hunter v. Colvin, 806 F.3d 487, 488-89 (9th Cir. 2015).  While an ALJ's findings must be properly supported and sufficiently specific to assure a reviewing court that the ALJ did not "arbitrarily discredit" a claimant's subjective statements, an ALJ is not "required to believe every allegation" of disability.  Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989).[15]

## 2.    Summary of Plaintiff's Testimony.

At the January 2015 hearing, Plaintiff testified that she is not able to work

---

[15] Social Security Ruling ("SSR") 16-3p, 2017 WL 5180304, which is applicable to this case, eliminated the term "credibility" from the Agency's sub-regulatory policy.  SSR 16-3p makes clear "that assessments of an individual's testimony by an ALJ are designed to 'evaluate the intensity and persistence of symptoms after the ALJ finds that the individual has a medically determinable

23

because of pain in her lower back, right shoulder, hands, and left leg.  AR 72-74, 92.  She can stand about 30 minutes.  AR 78-79.  She can walk for 10 to 15 minutes.  AR 80.  She often needs to change positions, from sitting to standing and/or walking.  AR 77-79.  The most she can lift is a gallon of milk.  AR 80.[16] AR 40.  She does not have strength in her hands; she cannot open jars or wash dishes because she drops them.  AR 74-75.  Even after her right hand CTS release surgery, she does not feel strong enough to hold or grab things.  AR 85-86.  She has difficulty combing her hair.  AR 81-82.  She tries to do the laundry, but her children have to help her with folding clothes.  AR 89.  After reaching or using her hands for 30 minutes, she would need to stop and rest for an hour.  AR 82-85. She used to drive a lot before June 2012, but she now just drives to the store.  AR 67-69.  She lies down to rest two or three times per day for an hour.  AR 87.

At the August 2017 hearing, she testified she experiences lower back, shoulder, and knee pain.  AR 38.  She has problems with swollen hands and with the joints in her hands.  AR 40-41.  She can walk maybe a block.  AR 38-39.  She can sit an hour or less before she feels pain.  AR 39-40.  The most she can lift is a gallon of milk.  AR 40-41.  She elevates her legs three or four times per day for about 20 minutes.  AR 43-44.  She can drive a small car for short distances.  AR 43.  She still has problems with her right shoulder even after her 2016 surgery.  AR 45-46.  She has difficulty using her hands for activities such as washing the dishes; she is unable to stand to wash dishes for more than 30 minutes.  AR 48-49.

At the March 2021 hearing, she testified that her condition was largely the

---

impairment(s) that could reasonably be expected to produce those symptoms,' and not to delve into wide-ranging scrutiny of the claimant's character and apparent truthfulness." Trevizo v. Berryhill, 871 F.3d 664, 678 n.5 (9th Cir. 2017) (quoting SSR 16-3p) (alterations omitted).
   **Error! Main Document Only.**
   [16] "A gallon of milk weighs 8.6 [pounds]."  See https://dairy-cattle.extension.org/how-much-does-milk-weigh.

same from August 2017 to 2021.  Since the 2017 hearing, her hands are swollen
and she cannot hold many things.  She has had a difficult time moving her arms
since her shoulder surgery.  She is unable to work because she is tired, swollen,
and has hip issues.  AR 2488-89.

### 3.    The ALJ's Evaluation of Plaintiff's Testimony.

The ALJ summarized Plaintiff's March 2021 hearing testimony.  AR 2459.
The ALJ found that while Plaintiff's MDIs "could reasonably be expected to cause
the alleged symptoms," Plaintiff's "statements concerning the  intensity,
persistence and limiting effects of these symptoms are not entirely consistent with
the medical evidence and other evidence in the record for the reasons explained in
this decision."  AR 2459.  The ALJ gave at least six reasons for discounting
Plaintiff's symptom testimony: (1) the lack of supporting objective medical
evidence (AR 2459); (2) Plaintiff's inconsistent symptom reporting (2459, 2472);
(3) inconsistency with her reported activities (AR 2462-63, 2465);
(4) improvement in her CTS symptoms following right-hand release surgery (AR
2460-61, 2473); (5) conservative treatment for her cervical and lumbar back pain
(AR 2461-63); and (6) improvement in her right shoulder following surgery (AR
2463-64, 2473).[17]

### 4.    Analysis of Claimed Error.

### a.    <u>Reason One</u>: Lack of Supporting Objective Medical Evidence.

In support of this first reason, the ALJ noted, as an example, that many
physical examinations showed that Plaintiff was "fully ambulatory with no
neurological deficit."  AR 2473.[18]  This stands in stark contrast to Plaintiff's

---

[17] Contrary to Plaintiff's assertions (<u>see</u> JS at 40-41, 43-44, 48-49), the ALJ
did not discount Plaintiff's symptom testimony solely based on the lack of
supporting objective medical evidence

[18] Citing AR 413 (9/11/12), 688 (7/17/13), 696 (6/26/13), 703 (5/22/13), 781
(11/26/13), 846 (11/20/13), 912 (10/8/13), 919 (8/20/13), 925 (5/14/13), 932-33

testimony that she could only walk a block (AR 38-39, 80) and had trouble holding things (AR 74-75, 85-86, 2489).

The ALJ further noted that, while Plaintiff testified that she started dropping things in 2012 and that she does not have strength in her hands (AR 74-75, 85-86, 2489); see also AR 790 (Plaintiff reported in October 2013 that she drops things and breaks glasses because of her CTS), 779 (Plaintiff reported in November 2013 that she was "dropping objects"), 1366 (reporting in January 2016: "In 2012 (after her shoulder pain), she began to feel some pain in her hands.  She noticed that she was dropping things and did not have any strength."), Plaintiff displayed normal or only slightly impaired grip strength at several physical examinations (AR 2468-69[19]), and testing showed no neurological deficits (AR 2468-69[20]).

The ALJ further noted that, although Plaintiff testified about experiencing right shoulder pain even after her 2016 surgery (AR 45-46, 2488-89), physical examination and testing on her right shoulder yielded negative results.  AR 2464, 2467-68, citing AR 2294 (2/22/17), 2309-10 (4/17/17), 3102, 3504 (12/22/17), 3526 (4/8/17) ; see also AR 3204-06 (in December 2018, Plaintiff complained of right shoulder pain which she rated 7-8/10, but right shoulder range of motion was mostly normal and various tests were negative).

The ALJ's discounting of Plaintiff's subjective symptom testimony because

---

(4/10/13), 968 (1/14/14), 982 (1/23/14), 1031 (6/10/14), 1037 (6/21/14), 1044-45 (3/19/14), 1051 (1/19/14), 1064 (3/14/14), 1210 (9/29/14), 1307 (11/14/14), 1857 (3/15/16), 2293, 2296 (2/22/17), 2377 (7/14/17), 2870 (8/29/17), 3998 (2/29/20); see also AR 287 (in a face-to-face interview on 8/14/13, SSA staff did not observe Plaintiff having any difficulty walking or using her hands).

[19] Citing AR 781 [11/26/13], 995 [1/27/14], 1104 [2/7/14], 1198 [8/26/14], 2293 [2/22/17]; see also AR 980 [1/23/14])

[20] Citing AR 781 [11/26/13], 846 [11/20/13], 912 [10/8/13], 919 [8/20/13], 924 [5/14/13], 933 [4/10/13], 968 [1/14/14], 1031 [6/10/14], 1037 [5/21/14], 1044 [3/19/14], 1051 [1/29/14], 1064 [3/14/14], 1307 [11/14/14], 2296 [2/22/17], 4000 [2/29/20]) .

it was inconsistent with the objective medical evidence was a clear and convincing reason supported by substantial evidence.  See Carmickle v. Commissioner, 533 F.3d 1155, 1161 (9th Cir. 2008) ("Contradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony.").

Plaintiff contends that the ALJ only summarized the medical evidence and did not actually identify any inconsistencies between the medical evidence and her testimony.  (JS at 38-40, 48.)  As discussed above, however, the ALJ adequately identified the lack of support for Plaintiff's alleged symptoms from Plaintiff's medical records.

Plaintiff also contends that the ALJ erred by not explaining why he disagreed with the State Agency consultant's findings that Plaintiff's allegations were objectively supported.  (JS at 39, 48, citing AR 110.)  In October 2013 (prior to Plaintiff's testimony at any hearing), V. Phillips, M.D., found that Plaintiff was capable of walking and/or standing and of sitting for about six hours per workday, but that she was limited in her lower extremities with respect to her abilities to push and/or pull and to handle (gross manipulation).  AR 110-11.  While Dr. Phillips found that Plaintiff's pain testimony was substantiated by the objective medical evidence (AR 110), Dr. Phillips clearly did not credit (or consider) Plaintiff's statements that she could only walk for 10 to 15 minutes and that she does not have strength in her hands and drops things.  Plaintiff has neither alleged nor demonstrated legal error in the ALJ's evaluation of Dr. Phillips's opinion.

b.    **Reason Two: Inconsistent Symptom Reporting.**

The ALJ noted several contradictions between Plaintiff's statements about her symptoms at various times.  AR 2459-69.  For example, although approximately 3 weeks after shoulder surgery she rated her average right shoulder pain as "7/10" (AR 2014), and although almost one year after the surgery she reported that her "shoulder [was] currently causing minimal issues" and her "[p]ain

and disability [were] not felt to be mainly from shoulder," as the ALJ noted (AR 2464, citing AR 2309), she complained of constant right shoulder pain rated as 7 to 8/10 more than 18 months after the surgery (AR 3204). Moreover, the ALJ noted that, while Plaintiff testified that her right hand loss of functionality was essentially "the same" before and after her October 2014 carpal tunnel release surgery, and that she eventually needed the same surgery on her left hand (AR 47), she told Dr. Hadley in January 2018 that she was pleased with the results of right carpal tunnel surgery and she reported no left CTS symptoms that would require surgery. AR 2460-61, citing 3113-15.

Thus, the ALJ's second reason for discounting Plaintiff's subjective symptom testimony – inconsistent symptom reporting – was a clear and convincing reason supported by substantial evidence. See Medina v. Saul, 840 Fed. Appx. 71, 73 (9th Cir. 2020) (the ALJ's finding of inconsistent symptom reporting was a clear and convincing reason for discounting the claimant's testimony); Smolen v. Chater, 80 F.3d 1274, 1284 (9th Cir. 1996) (an ALJ can consider a claimant's "prior inconsistent statements concerning the symptoms" in evaluating a claimant's testimony).

c. **Reason Three: Inconsistent Activities.**

The ALJ noted that during her claimed period of disability, Plaintiff was able to exercise regularly at a moderate to strenuous level and travel to Mexico. AR 2461-63, 2465, 2472. The ALJ cited the following Kaiser records concerning Plaintiff's exercise in 2012-2014 (AR 2461-63, 2465):

| Exh. | AR | Date | Note |
|------|-----|---------|------|
| 1F/41 | 388 | 7/25/12 | "The patient exercises 50 minutes per week at a moderate to strenuous level." |
| 1F/118 | 465 | 10/22/12 | "The patient exercises 80 minutes per week at a moderate to strenuous level." |
| 1F/180 | 527 | 4/1/13 | "The patient exercises 90 minutes per week at a moderate to strenuous level." |

| | | | |
|---|---|---|---|
| 1F/209 | 556 | 7/10/13 | "The patient exercises 80 minutes per week at a moderate to strenuous level." |
| 1F/218 | 565 | 7/23/13 | "The patient exercises 60 minutes per week at a moderate to strenuous level." |
| 6F/10 | 818 | 9/26/13 | Plaintiff "exercises 10 minutes 2 days per week at a moderate or strenuous level." |
| 17F/11 | 1085 | 1/8/14 | "The patient exercises 20 minutes per week at a moderate to strenuous level." |
| 17F/54 | 1128 | 3/5/14 | "The patient exercises 40 minutes per week at a moderate to strenuous level." |
| 17F/62 | 1136 | 4/11/14 | "The patient exercises 100 minutes per week at a moderate to strenuous level." |
| 17F/96 | 1170 | 5/22/14 | "The patient exercises 40 minutes per week at a moderate to strenuous level." |
| 19F/71 | 1284 | 10/27/14 | "The patient exercises 30 minutes per week at a moderate to strenuous level." |

Additional evidence of Plaintiff's exercise includes: (1) in September 2012, Plaintiff complained of urinary incontinence "with fast walking" (AR 456); and (2) in April 2014, Plaintiff answered "yes" when asked, "Do you exercise or spend time doing activities such as walking, gardening swimming ½ hour a day?" (AR 1150).

Plaintiff argues, in the section challenging the ALJ's rejection of Dr. Hnat's opinions, that "exercise from 2012 to 2014 on a limited basis" is not a clear and convincing reason to discount her subjective symptom testimony. (JS at 22.) But Plaintiff contends that she became too disabled to work as of June 2012. AR 69. In January 2015 (just a few months after she reported regular exercise to Kaiser physical therapy), Plaintiff testified that in June 2012, she had too much pain to continue working. AR 69-70. She further testified that she could only walk for 10-15 minutes. AR 80. Thus, substantial evidence supports the ALJ's finding that the amount and level of Plaintiff's exercise was inconsistent with her testimony about the limiting effects of her pain.

Plaintiff also cites Kaiser records saying that Plaintiff reported "zero"

minutes of exercise in 2017 and 2019 and accuses the ALJ of cherry-picking the evidence.  (JS at 22, citing AR 2335, 2906, 4010.)  The ALJ, however, adequately supported a finding of inconsistency and did not need to show that Plaintiff's symptom testimony was inconsistent with *every* medical record.  Moreover, Plaintiff reported elsewhere that she was active after 2014 to a greater degree than described in her hearing testimony.  See e.g., AR 1367 (reporting in January 2016, "Her hobbies include gardening and playing volleyball.  She states that she has had to decrease her gardening in the past three years due to pain and has not been able to play volleyball as well."); AR 2360 (reporting in July 2017, "Home make[r], busy at home, stands most of the day"); compare AR 78, 87 (testifying at January 2015 hearing that for the last two and half years she could only stand for about 30 minutes and that she lies down to rest two or three times per day for an hour), 48 (testifying at August 2017 hearing that she had a "problem" standing for more than a half hour).

Because the ALJ provided three legally sufficient reasons for discounting Plaintiff's subjective testimony, the Court need not discuss the other reasons.

**B.   ISSUES ONE, TWO, THREE, FOUR, AND SIX-B: MEDICAL OPINION EVIDENCE.**

In Grounds One through Four and Six-B, Plaintiff contends that the ALJ erred in his evaluations of the medical opinions of five different physicians: (1) Dr. Jarminski; (2) Dr. Mann; (3) Dr. Hnat; (4) Dr. Dorsey; and (5) Dr. Sharma. (JS at 2-5, 8-13, 15-23, 28-33, 36-45, 49-51, 53-54.)

**1.   Relevant Law.**

An ALJ must consider all relevant medical opinions of record. 20 C.F.R. § 404.1527(b).  For applications filed before March 27, 2017, like Plaintiff's, the regulations "distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat

30

the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995), as amended (Apr. 9, 1996). "Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing physician's." Holohan v. Massanari, 246 F.3d 1195, 1202 (9th Cir. 2001). Nevertheless, the ALJ is not bound by the opinion of a treating physician. Smolen, 80 F.3d at 1285.

The medical opinion of a claimant's treating physician is given "controlling weight" so long as it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. § 404.1527(c)(2). "When a treating doctor's opinion is not controlling, it is weighted according to factors such as the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, and consistency with the record." Revels v. Berryhill, 874 F.3d 648, 654 (9th Cir. 2017); 20 C.F.R. § 404.1527(c)(2)-(6).

"If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Trevizo v. Berryhill, 871 F.3d 664, 675 (9th Cir. 2017).

**2.** Summary of and the ALJ's Treatment of the Opinion Evidence.

**a.** **Dr. Jarminski**

Dr. Jarminski, an occupational medicine specialist, treated Plaintiff on ten occasions from May 2013 to June 2014. AR 591-98, 601-15, 666-72, 710-16, 790-

31

96, 958-64, 1057-58, 1059-65, 1067-73.  From June 2013 to January 2014, Dr. Jarminski administered four Kenalog injections to Plaintiff's right shoulder.  AR 613, 681, 795, 1072.

In a November 2013 questionnaire, Dr. Jarminski opined that Plaintiff has the ability to do the following work-related activities:  lift/carry 0 pounds; sit for one-half hour in an 8-hour workday; stand/walk for one-half hour in an 8-hour workday; occasionally perform simple grasping and fine manipulation bilaterally; never reach bilaterally; take unscheduled breaks frequently; and be absent from work more than 3 times a month.  AR 853-56.

The ALJ gave the questionnaire little weight because "Dr. Jarminski did not have the benefit of considering the complete record or treating all of [Plaintiff's] severe impairments" and it was "inconsistent with the longitudinal medical evidence, which reveals normal motor strength, normal sensation, and normal gait, discussed above."  AR 2470.

### b.  Dr. Mann

In January 2016, Dr. Mann, an orthopedist, performed a QME in Plaintiff's workers' compensation case.  AR 1365-1440.  Plaintiff complained of right arm, left arm, lower back, right shoulder, and bilateral wrist pain.  AR 1365, 1368. Physical examination results included normal range of motion of the elbows, no atrophy and normal range of motion of the wrists, diffuse tenderness over the wrists, positive Phalen's tests (a diagnosis test for CTS), reduced right-hand grip strength, and normal strength for standing on heels and on toes and squatting.  AR 1369-70.  Dr. Mann provided an extensive summary of the medical records from August 2012 to July 2014, which included Plaintiff's testimony in a June 2014 deposition.  AR 1370-1408.  Dr. Mann diagnosed Plaintiff with "[l]umbar strain with unconfirmed left radiculopathy," "[r]otator cuff tear, right shoulder," "[b]ilateral [CTS]," and "[s]tatus post endoscopic right [CTS] surgery with

persistent right [CTS]."  AR 1408.  Dr. Mann opined that Plaintiff should limit her activities involving grasping and pushing/pulling with her bilateral upper extremities to no more than 2 to 4 hours a day; and that she should avoid lifting/carrying items that weigh more than 10 pounds at a height of 3 to 6 feet for more than 1 hour per day.  AR 1410, 1425.

The ALJ gave this 2016 opinion little weight because it was inconsistent with: (1) Dr. Mann's own physical examination which showed "only diffuse tenderness over the wrists and positive Phalen's test with normal range of motion of the upper extremities and no atrophy" (AR 2470, citing AR 1369-70); (2) the results of Dr. Mann's neurological examination of Plaintiff's upper and lower extremities, which showed "two-point discrimination in the upper extremity," characterized by the ALJ as "inconsistent and not interpretable," and which showed that "otherwise, strength was normal with toe flexion and extension" (AR 2470, citing AR 1370); and (3) "the longitudinal medical evidence, which reveals normal motor strength, normal sensation, and normal gait, discussed above" (AR 2471).[21]

### c.   Dr. Hnat

#### 1.   2014 Opinion

Dr. Hnat, a rheumatologist, treated Plaintiff for RA and fibromyalgia on several occasions from August 2011 through November 2017.  AR 1210, 2291,

---

[21] As Plaintiff points out (JS at 12), Dr. Mann performed a Qualified Medical Re-Evaluation on December 6, 2018.  AR 3204-12.  At the re-evaluation, Plaintiff stated that all of her symptoms had worsened since January 2016.  AR 3204-05.  Following physical examination (AR 3206-09), Dr. Mann opined that Plaintiff should be restricted from "[w]ork at or above shoulder level on the right," "[r]epetitive sustained or forceful pushing, pulling, twisting, gripping, or grasping on the right," "[p]rolonged repetitive use of both upper extremities," and lifting more than two pounds.  AR 3211.

Since Plaintiff does not challenge the ALJ's evaluation (or non-evaluation) of Dr. Mann's December 6, 2018 opinion, the Court will not discuss it.

3015, 3150, 4004. [22]

In a September 2014 questionnaire (Arthritis Medical Source Statement), Dr. Hnat opined that Plaintiff could lift/carry less than 10 pounds rarely and 10 to 50 pounds never; could sit for 30 minutes at one time and less than 2 hours in an 8-hour workday; could stand for 30 minutes at one time; stand/walk for less than 2 hours in an 8-hour workday; needed a job permitting shifting at will from sitting, standing, or walking; could never twist, stoop, crouch, climb ladders, and climb stairs; could never handle, finger, reach in front of the body, or reach overhead with the bilateral upper extremities; required unscheduled breaks, needed to lie down, hourly during the workday; would be off task more than 25% of a typical workday; and would be absent from work more than 4 days per month.  AR 1211-13.

The ALJ gave this opinion little weight for several reasons.  First, the ALJ noted that Dr. Hnat "is not an orthopedic specialist" and "based the extreme limitations on sifting, standing, and walking based upon an assessment of [Plaintiff's] low back pain" (AR 2471, citing AR 1210), but that "medical records indicate that after [Plaintiff] stopped treating with her workers' compensation doctors in June 2014 and she did not seek further treatment for low back pain until November 2014."  AR 2471.  Second, the ALJ found that "the November 2014 lumbar MRI findings, which were contemporaneous with Dr. Hnat's September 2014 questionnaire, revealed mostly mild findings and did not definitively indicate nerve root involvement."  AR 2471, citing AR 1313.  Third, the ALJ found this opinion "inconsistent with the longitudinal medical evidence, which reveals normal motor strength, normal sensation, and normal gait, discussed above"  AR 2471.

_____

[22] The first and last progress notes of a visit by Plaintiff with Dr. Hnat in the record are dated June 18, 2012 and November 13, 2017.  AR 365, 3015.

## 2. 2016 and 2017 Opinions

In a November 2016 letter, Dr. Hnat opined as follows:  Plaintiff "is "completely disabled and unable to work in any capacity due to multiple medical conditions."  Dr. Hnat based this opinion on Plaintiff's "inflammatory polyarthritis affecting her hand and wrists," "fibromyalgia with diffuse pain," "severe pain in her neck and back due to degenerative disc changes causing constant pain," "restricted right shoulder range of motion despite surgery in May[] 2016," "severe fatigue," and need for "rest periods in bed after any activity due to pain and fatigue."  AR 2291.[23]

In a July 2017 progress note, Dr. Hnat wrote that Plaintiff "remains disabled by multiple medical conditions[.]"  AR 2392.

The ALJ gave these opinions little weight because they were opinions on the ultimate issue of disability, an issue reserved for the ALJ.  AR 2471.

## 3. 2018 Opinion

In a letter dated August 2018 (more than 7 months after Plaintiff's LDI), Dr. Hnat opined that RA "limits any repetitive use of [Plaintiff's] hands and wrists,"

---

[23] Earlier in November 2016, Dr. Hnat completed a "Medical Assessment of Ability to Do Work-Related Activities."  AR 1441-42.  Dr. Hnat found that Plaintiff could lift/carry 10 pounds for her activities of daily living, but not in a work environment, based on her "limited range of motion of shoulder" and "pain/swellings of finger joints"; could sit 2 hours at a time without interruption and a total of 2 hours in an 8-hour workday; could stand and walk for one hour at a time without interruption, and stand/walk for a total of one hour in an 8-hour workday, based on fatigue and lower back pain; and could never do bilateral grasping, fine manipulation or reaching due to joint pain, finger joint limitation, and restricted right shoulder range of motion.  AR 1441.  Dr. Hnat further found that Plaintiff would need to take unscheduled breaks for 30 minutes every 2 hours due to pain and fatigue and would likely be absent from work more than 3 times a month.  AR 1442.

It appears that the ALJ did not discuss this opinion.  Plaintiff, however, does not challenge the ALJ's evaluation of this opinion. `

that Plaintiff "has pain in her lower extremity joints with walking and standing," and that Plaintiff "is unable to do even minimal activities without aggravating pain and increasing fatigue." AR 3150.

The ALJ gave this opinion partial weight. The ALJ found the portion of this opinion stating that Plaintiff could not do "even minimal activities without aggravating pain and increasing fatigue" was "inconsistent with the medical record, which shows that [Plaintiff] had no synovitis and improvement with Enbrel, discussed above." AR 2471.

### 4. 2020 Opinion

In an April 2020 letter (almost 2½ years after Plaintiff's LDI), Dr. Hnat opined that: (1) Plaintiff is disabled because her RA "is resistant to medications and she has chronic pain and limitations in her upper extremity joints" and "she has structural changes in her neck and lumbar spine causing pain and impingement symptoms"; (2) Plaintiff "is unable to do any work requiring prolonged standing because of back pain"; (3) Plaintiff "can not do any repetitive work because of upper extremity arthritis"; (4) Plaintiff "cannot type, lift, reach, push or pull in a work situation"; and (5) even if Plaintiff could work for a day or two, this would likely cause her to be absent from work for several days after because of an arthritis flare-up. AR 4004.

The ALJ gave little weight to this opinion because (1) it was not supported by the medical records showing travel to Mexico, exercise "at a moderate to strenuous level," being pleased with the right CTS release, no left CTS involvement, improvement of the cervical spine with acupuncture, conservative lumbar spine treatment, only arthritis in the right shoulder, and improvement in pain with Enbrel; (2) it was "inconsistent with the longitudinal medical evidence, which reveals normal motor strength, normal sensation, and normal gait, discussed above"; (3) the portion stating Plaintiff was "completely disabled" involved an

36

issue reserved from the ALJ; and (4) it was written long after Plaintiff's LDI.  AR 2472.

### d.   Dr. Dorsey

Dr. Dorsey, an orthopedic surgeon, began treating Plaintiff on March 20, 2018, about three months after her LDI, in connection with her workers' compensation claim  AR 3159.  On that date, Plaintiff completed a questionnaire describing her subjective complaints.  AR 3154-57.  Dr. Dorsey treated Plaintiff until September 11, 2018; there are handwritten notes from appointments.  AR 3151-53.

On September 11, 2018, Dr. Dorsey completed a "permanent and stationary" evaluation.  AR 3158-68.  Plaintiff complained of neck, shoulder, wrist, hand, left elbow, and lower back pain.  AR 3160.  Physical examination revealed that Plaintiff did not make "full effort" with respect to her grip strength, that range of motion of the left elbow "was full with pain at the limits of motion," and that she had a normal gait.  AR 3161-63.  Dr. Dorsey determined that Plaintiff had reached maximum medical improvement as of the date of his report.  AR 3164.  Although Dr. Dorsey  attributed "no impairment" to her left elbow (AR 3167), Dr. Dorsey nevertheless included a work restriction for her left elbow with others, as follows:

> For the neck, the patient is precluded from heavy lifting and prolonged sitting.  For the right and left shoulders, the patient is precluded from heavy lifting, reaching above shoulder level, repetitive pushing and pulling.  For the left elbow, no heavy lifting, repetitive pushing and pulling.  For both wrists and hands, the patient is precluded from repetitive forceful gripping and grasping.  For the lower back, no lifting over 10 pounds, prolonged standing, repetitive bending and prolonged sitting.

AR 3166-67.

The ALJ did not discuss Dr. Dorsey's opinions.

### e.   Dr. Sharma

In January 2014, Dr. Sharma, an orthopedic surgeon, completed a "permanent and stationary" evaluation for Plaintiff's worker's compensation claim. AR 972-91.  Dr. Sharma assessed Plaintiff as a "very poor historian" who "does not recall any details."  AR 973.  Plaintiff complained of hand, wrist, shoulder, neck, and lower back pain.  AR 973.  Physical examination revealed no tenderness of the shoulders, wrists and hands, a mostly normal range of shoulder motion, a normal range of wrist motion, normal finger motion, normal shoulder, hand and wrist strength, no shoulder impingement, normal grip strength (but Dr. Sharma opined her grip strength was "limited" by CTS and RA), no atrophy, positive Phalen's and Tinel's tests, "no difficulty" with normal walking but difficulty walking on her toes and heels due to back pain, a reduced range of motion of the lumbar spine, and no knee problems.  AR 976-87.  For work restrictions, Dr. Sharma made the following assessments:: for the lumbar spine and the cervical spine, "no heavy work"; and, "for bilateral [CTS], no repetitive use of the hand for pushing, pulling, gripping, or data entry work."  AR 990.

The ALJ did not discuss Dr. Sharma's opinions.

### 3.   Analysis of Claimed Errors.

### a.   Dr. Jarminski

Plaintiff, relying on Trevizo, supra, contends that, as to Dr. Jarminski's opinions, the ALJ was required to address the factors in 20 C.F.R. § 404.1527(c)(2)-(6) (i.e., the existence of a treating relationship, the length/frequency of the treating relationship, supportability, consistency, and specialization) in the decision, and that "failure to address the relevant factors alone warrant[s] remand." (JS at 3, 9.)

Although the Ninth Circuit in Trevizo found that the ALJ erred by failing to

consider such factors when evaluating the opinion of a medical source who had treated the claimant 22 times during the relevant years, <u>Trevizo</u>, 871 F.3d at 675-76, the Ninth Circuit has since clarified that ALJs do not need to address expressly each of the factors outlined in 20 C.F.R. § 404.1527(c) to demonstrate that they were considered. <u>See</u> <u>Kelly v. Berryhill</u>, 732 Fed. Appx. 558, 562 n.4 (9th Cir. May 1, 2018). It is enough that the ALJ gives some indication that the factors were considered. <u>Id.</u>

Here, the ALJ gave sufficient indication that he considered the relevant factors. The ALJ noted the length and nature of Dr. Jarminski's treating relationship with Plaintiff at the time he completed the November 2013 questionnaire. AR 2470. The ALJ further noted Dr. Jarminski's area of specialization. AR 2470. The ALJ also discussed deficits in supportability and consistency, as discussed below. AR 2470.

Plaintiff argues that the ALJ erred by not discussing all of Dr. Jarminski's progress notes. (JS at 3-4, 9.)

The ALJ did, however, discuss records from Dr. Jarminski's treating relationship with Plaintiff that existed as of the date of the November 2013 questionnaire. AR 2461-63, citing AR 613 (progress note dated 6/12/13), 671 (progress note dated 9/4/13), 681 (progress note dated 7/26/13), 795 (progress note dated 10/25/13), 719-24 (2/13/13 MRIs of right shoulder, left shoulder, lumber spine, and cervical spine). Plaintiff fails to explain why logically the ALJ needed to discuss Dr. Jarminski's later progress notes to explain why his November 2013 opinions lacked support. Moreover, Dr. Jarminski's opinions about Plaintiff's abilities (with the exception of her likely absenteeism from work), as discussed above, were expressly based on findings in the MRIs (AR 852-53) – presumably the four February 2013 MRIs, <u>see</u> <u>e.g.</u>, AR 595 (progress note dated 9/4/13, stating that Dr. Jarminski had reviewed four February 2013 MRIs) – which the ALJ did

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

discuss, as noted above, and not on physical examination findings which Plaintiff contends the ALJ should have discussed (JS at 2-3, 9).  Furthermore, Dr. Jarminski did not cite to any evidence which supported his opinion regarding Plaintiff's likely absenteeism from work.  AR 853 (as a support for his opinion, Dr. Jarminski wrote "Pt. is T.T.D.!").  Plaintiff fails to demonstrate legal error with this argument.

Plaintiff next contends that the ALJ failed to give Dr. Jarminski's opinions the deference due the opinions of a treating physician.  (JS at 4.)

Since Plaintiff does not dispute that Dr. Jarminski's opinions were contradicted by other opinions, the ALJ needed only to give specific and legitimate reasons for rejecting them, as Plaintiff admits (JS at  10).  Thus, what matters is whether the ALJ's stated reasons for giving little weight to Dr. Jarminski's opinions were specific, legitimate, and supported by substantial evidence (i.e., the supportability and consistency issues discussed below) – not Dr. Jarminski's status as one of Plaintiff's many treating physicians.

Plaintiff challenges the ALJ's first stated reason for rejecting Dr. Jarminski's November 2013 opinions, specifically, that Dr. Jarminski's opinions were made without the benefit of considering the complete record or treating all of Plaintiff's severe impairments (AR 2470).  Plaintiff argues that this reason, even if true, is legally insufficient because a treating physician need not "review the complete record or treat all conditions for his opinion to be credible."  (JS at 4.)  According to Plaintiff, a treating physician's own physical examination findings may be sufficient to support his or her opinions.  (JS at 4-5.)

While that theoretically may be possible, Dr. Jarminski's restrictive opinions were based on MRI findings and/or no findings and not his own physical examination findings, as noted above.  Moreover,  Dr. Jarminski's progress notes

1   simply do not contain data supporting his extreme opinions.[25]  Dr. Jarminski's

2   progress notes for the relevant period do not reflect a total loss of strength and the

3   absence of shoulder/upper extremity range of motion, and they do not contain any

4   notations regarding reasons for Plaintiff's excessive absenteeism.  See AR 592-95,

5   602-05, 610-13, 667-70, 711-14, 791-94, 959-62, 1060-63.

6        Plaintiff also challenges the ALJ's second stated reason for rejecting Dr.

7   Jarminski's November 2013 opinions, arguing that "inconsistency with the

8   longitudinal medical evidence, which reveals normal motor strength, normal

9   sensation, and normal gait," was "not sufficiently specific."  (JS at 4, 9.)

10       Here, the ALJ explained that the finding of inconsistency was based, in part,

11  on other records showing "normal motor strength."  AR 2470.  For example, while

12  Dr. Jarminski opined that Plaintiff could not lift or carry any weight and could

13  "never" reach with either arm (AR 855), the ALJ observed that Plaintiff displayed

14  full motor strength in many medical records from approximately the same time

15  period.[26]  This contrast adequately explains the ALJ's reasoning and is well

16

17      [25] Some of Dr. Jarminski's opinions were not even supported by Plaintiff's

18  testimony.  Dr. Jarminski opined that Plaintiff could never lift/carry any weight

19  (AR 855), but Plaintiff admitted she could lift a gallon of milk (AR 40, 80).  Dr.
    Jarminski also opined that Plaintiff could never reach bilaterally (AR 855), but

20  Plaintiff thought she could reach for 30 minutes (AR 82-83, 85).

21      [26] AR 2469, citing AR 413 (9/11/12: "motor strength of lower extremities:
    intact"), 781 (11/26/13: hand motor strength "intact"), 846 (11/20/13: "normal"

22  motor strength for shoulders, elbows, and wrists), 912 (10/8/13: same), 919
    (8/20/13: same), 925 (5/14/13: same), 932-33 (4/10/13: same), 939 (6/26/13: "no

23  localized motor deficit of either upper extremity although she does have

24  generalized weakness"), 945 (5/22/13: same), 968 (1/14/14: hand motor strength
    "intact"), 1031 (6/10/14: "normal" motor strength for shoulders, elbows, and

25  wrists), 1037 (5/21/14: same), 1064 (3/14/14: hand motor strength "intact"), 1307

26  (11/14/14: "normal motor skills" and "normal strength"), see also AR 960
    (12/13/13: 5/5 shoulder strength for all types of motion), 1061 (3/14/14: same),

27  2296 (2/22/17: "Gross evaluation of selectively-tested muscles in the upper and

28  lower extremities reveal no weakness.").

1    supported by the record .

2        Finally, Plaintiff contends that the ALJ should have given specific reasons

3    for rejecting each of Dr. Jarminski's opinions, including his opinion about how

4    often she would likely miss work.  (JS at 4, 1-11.)

5        Having provided specific and legitimate reasons for giving Dr. Jarminski's

6    opinions little weight based on consideration of the regulatory factors and

7    supported by substantial evidence, the ALJ was not required to do more.  <u>See</u>

8    <u>Daniel J. v. Comm'r of Soc. Sec.</u>, 2019 WL 1615240, at *4 (W.D. Wash. Apr. 16,

9    2019) ("Having decided to give the opinion limited weight, the ALJ was not

10   required to give separate reasons for rejecting each component of the opinion.").

11       **b.    Dr. Mann**

12       Plaintiff notes that, while the ALJ in November 2017 gave partial weight to

13   Dr. Mann's 2016 opinions (AR 25), the same ALJ in December 2021 gave little

14   weight to Dr. Mann's 2016 opinions, without explaining the change.  (JS at 12,

15   16).[27]  Plaintiff, however, does not allege that the ALJ committed legal error by

16   changing the weight given to Dr. Mann's 2016 opinions.  In any event, the ALJ's

17   decision in December 2021 to give little weight to Dr. Mann's 2016 opinions may

18   have resulted from greater knowledge/insight based on additional evidence in the

19   record.

20       Plaintiff contends that the ALJ failed to explain why "diffuse tenderness and

21   positive Phalen's signs do not support Dr. Mann's opinion."  (JS at 12, 16.)

22       The ALJ determined that the examination findings of "diffuse tenderness

23   over the wrists" and positive bilateral Phalen's tests (suggestive of CTS) were not

24   as significant as the unremarkable physical examination findings, including no

25

26   _____

27       [27] As a result of the change, the ALJ in December 2021 found that Plaintiff
     could "frequently," rather than "occasionally," bilaterally reach overhead and in
28   other directions, handle, finger, feel and push/pull.  AR 2459; <u>compare</u> AR 22, 25.

atrophy of the wrists and normal range of motion of the elbows and wrists (AR 1368-69).  AR 2740.  The ALJ provided sufficient explanation to understand his reasoning,  Rather than playing the role of doctor and rendering an improper medical opinion, as Plaintiff contends (JS at 12-13, 16), the ALJ satisfied his obligation to evaluate the evidence in the record, such as physical examination findings, and to determine Plaintiff's RFC.  See Macri v. Chater, 93 F.3d 540, 544 (9th Cir. 1996) (an ALJ "is entitled to draw inferences logically flowing from the evidence") (citation and internal quotation marks omitted); 20 C.F.R. §§ 404.1546(c) (an ALJ is responsible for assessing a claimant's RFC), 404.1545(a)(3) (an ALJ assesses a claimant's RFC "based on all the relevant medical and other evidence"); SSR 96-5p, 1996 WL 374183, at *2 (it is the responsibility of the ALJ, relying on all the relevant medical and non-medical evidence of record, to formulate a claimant's RFC); see also Carol F. v. Saul, 20121 WL 1200041, at *5 (C.D. Cal. Mar. 30, 2021) (finding that the ALJ did not act as his own medical expert because he did not "interpret raw medical data in functional terms," "go outside the record to medical textbooks to make his 'own exploration and assessment' as to a claimant's impairments," or "make [his] own independent medical findings") (citations omitted).

Plaintiff next contends that the ALJ's rejection of Dr. Mann's opinions because of their inconsistency "with the longitudinal medical evidence, which reveals normal motor strength, normal sensation, and normal gait, discussed above" (AR 2471-72) was "not sufficiently specific."  (JS at 13, 16.)

Plaintiff appears to repeat the argument she made when challenging the ALJ's rejection of Dr. Jarminski's opinions.  While Dr. Mann imposed extreme limitations on Plaintiff's use of her arms (AR 1410), numerous medical records contained physical examinations reflecting normal and/or intact motor strength and intact sensation, as the ALJ noted.  AR 2469, citing records (summarized and/or

43

discussed above).  Dr. Mann's third reason for rejecting Dr. Mann's opinions – inconsistency with the medical evidence – was sufficiently specific.

Finally, Plaintiff contends that the ALJ failed to consider Dr. Mann's opinion that Plaintiff should not lift or carry more than 10 pounds for more than an hour a day.  (JS at 13, 16.)

As Plaintiff points out (JS at 12, 15), the Appeals Council's August 24, 2019 remand order states that the ALJ's consideration in November 2017 of Dr. Mann's opinion was not sufficient because the ALJ in did not clearly address the ten-pound lifting limitation.  AR 2564 (stating that "[f]urther clarification of Dr. Mann's opinion is necessary on remand").

Plaintiff fails to cite any authority holding that an ALJ commits legal error when he or she fails to do something in accordance with an Appeals Council's remand order.  Moreover, although the ALJ did not explicitly state that his reasons for giving little weight (i.e., inconsistency with his physical examination and inconsistency with the longitudinal medical evidence, which the Court has found to be valid reasons) apply to Dr. Mann's lifting limitation, it is clear from the ALJ's discussion that those reasons also apply to Dr. Mann's lifting limitation. Therefore, the ALJ did, in fact, clarify why he was rejecting Dr. Mann's lifting limitation.

### c.   Dr. Hnat

Plaintiff contends that the ALJ should have recognized that Dr. Hnat specialized in internal medicine and rheumatology and therefore accorded her opinions more weight. JS at 18, citing https://www.healthgrades.com/physician/dr-dawn-hnat-ycwy5 and 20 C.F.R. § 404.1527(c)(5); JS at 28.

The ALJ clearly understood and considered Dr. Hnat's rheumatology specialization based on the title of the September 2014 questionnaire  -- "Arthritis Medical Source Statement."  AR 1210.  Moreover, the ALJ would have understood

Dr. Hnat's rheumatology specialization based on Dr. Hnat's statements that Dr. Hnat was treating Plaintiff's rheumatological issues, and not Plaintiff's orthopedic issues, see e.g., AR 3150 (2018: "She is under my care for Rheumatoid Arthritis affecting her hands, wrists, and ankles. . . .  [She] is also under the care of other physicians for neck and low back pain due to degenerative changes."), 4004 (2020: "[Plaintiff has been under my care since August 24, 2011 for Rheumatoid Arthritis. . . . [Plaintiff] is under the care of other physicians for neck and low back pain due to degenerative changes."), as well as Dr. Hnat's focus on Plaintiff's RA and fibromyalgia throughout her treatment of Plaintiff, see e.g., AR 366, 380, 400, 444, 465, 485, 505, 516, 527, 549, 574, 812, 834, 1095, 1114, 1159, 1178, 1188, 1284, 1522, 1581, 1591, 1608, 1640, 1706, 1746, 1772, 1800, 1830, 1884, 2072, 2154, 2266, 2317, 2392, 2905, 3016.

Plaintiff argues that the ALJ did not address all Dr. Hnat's treatment records.  (JS at 20, 28.)  Plaintiff does not specify what treatment records Dr. Hnat did not address, or how the unaddressed treatment records would have made a difference to the ALJ's evaluation of Dr. Hnat's opinions.  Therefore, Plaintiff fails to demonstrate legal error with this argument.

Plaintiff contends that the ALJ improperly discounted Dr. Hnat's 2014 and 2020 opinions as "inconsistent with the longitudinal medical evidence, which reveals normal motor strength, normal sensation, and normal gait."  Plaintiff claims that, since Dr. Hnat's opinions were not based on findings of abnormal strength, sensation, and gait, the ALJ improperly relied on findings of normal strength, sensation, and gait.  (JS at 20-22, citing AR 2471-72; see also JS at 30.)

Since Dr. Hnat in the 2014 opinion identified, among other things, sensory changes and reduced grip strength as positive objective signs supporting the arm and hand use restrictions (AR 1210, 1212-13), the physical examination findings of normal and/or intact motor strength and intact sensation, as a whole, were properly

relied on by the ALJ to discount Dr. Hnat's 2014 opinion.

Moreover, although Dr. Hnat in the 2020 opinion does not identify particular positive objective signs supporting the typing, lifting, reaching, pushing and pulling restrictions, but rather just describes Plaintiff's medical conditions and her pain, including pain in her arms, right shoulder and upper extremity joints (see AR 4004), it appears that Dr. Hnat continued to find that Plaintiff's strength and sensation affected her ability to use arms and hands.  Therefore, the ALJ did not err in finding that Dr. Hnat's opinion was inconsistent with the physical examination findings of normal and/or intact motor strength and intact sensation.

Plaintiff contends that "[t]he ALJ essentially rejected the 2014 opinion because it was based upon back issues and there were no corresponding strength, sensation, and gait abnormalities to support the opinion."  (JS at 21.)

As Plaintiff points out (JS at 20), the Appeals Council took issue with the Administrative Law Judge's 2015 decision giving Dr. Hnat's 2014 opinion little weight (AR 140).  AR 149.  However, the ALJ in 2021 provided a new reason to discount Dr. Hnat's September 2014 opinion regarding Plaintiff's sitting, standing, and walking limitations based on Plaintiff's lower back issues, namely, that the medical records reflect that Plaintiff apparently did not obtain treatment for her low back pain from June 2014 to November 2014.  AR 2471.  Plaintiff does not challenge this new reason.

Plaintiff argues that the ALJ improperly rejected Dr. Hnat's 2016 opinion because the ALJ did not consider the portion opining that Plaintiff "requires rest periods in bed after any activity due to pain and fatigue" (AR 2291).  (JS at 21, 29.)  However, the 2016 opinion, unlike the 2014 opinion (see AR 1212), does not specify the frequency or length of the rest periods.  It also does not specify the nature of the activities that would result in Plaintiff requiring bed rest.  Consequently, the ALJ did not fail to consider this limitation.

Plaintiff contends that the ALJ's discounting of Dr. Hnat's 2018 opinion that Plaintiff has limited use of her hands (AR 3150 [RA "limits any repetitive use of her hands and wrists"]) since it is "inconsistent with the medical record, which shows that the claimant had no synovitis and improvement with Enbrel, discussed above" (AR 2471) was improper, because RA, not synovitis,[28] caused Plaintiff's limited hand use, and because Enbrel did not provide sustained improvement. (JS at 21, 28.)

From the medical evidence, the correlation between synovitis and pain/functionality is unclear. Without such a correlation, it may have been improper for the ALJ to rely on the absence of synovitis to discount Dr. Hnat's 2018 opinion concerning Plaintiff's hand use. Whether the Enbrel Plaintiff took for RA starting in November 2017 (AR 3057, 3066) resulted in any real improvement is unclear. See AR 3072-73 (a few weeks after starting Enbrel, Plaintiff reported that "overall pain may be improved" with Enbrel and that she was "[s]till having pain especially at night but now better," but also reported that her hands were still swollen in the morning, that she "has a hard time getting going in the morning," that she has a lot of sciatic pain in the morning, that sleeping on her sides hurts her arms, and that "sleeping on her back hurts her back."); AR 3113, 3115 (approximately one month later, Plaintiff complained of "bilateral hand inflammation and pain increasing over the past few months" and physical examination revealed "[p]ositive wrist and

---

[28] "In RA, the body's immune system attacks the lining of the joint capsule, a tough membrane that encloses all the joint parts. This lining (synovial membrane) becomes inflamed and swollen." https://www.mayoclinic.org/diseases-conditions/arthritis/symptoms-causes/syc-20350772 (last viewed November 21, 2022). "Synovitis (or synovial inflammation) is when the synovium of a joint becomes inflamed (swollen)." https://www.hss.edu/condition-list_synovitis.asp (last viewed November 21, 2022). Synovitis is "common in people who have some form of inflammatory arthritis." Id.

47

finger swelling").

Even if these reasons were insufficient, any error on the part of the ALJ in discounting the 2018 opinion would be harmless based on the fact that the 2018 opinion does not concern Plaintiff's ability to function during the relevant period, which ended on Plaintiff's LDI of December 31, 2017, see Webb v. Barnhart, 433 F.3d 683, 685 (9th Cir. 2005). This opinion was issued more than 7 months after Plaintiff's LDI and does not contain language that would make it apply to Plaintiff retrospectively. Therefore, this opinion would not have affected the ALJ's determination about Plaintiff's functionality. See Stout v. Comm'r of SSA, 454 F.3d 1050, 1055-56 (9th Cir. 2006) (an ALJ's errors are harmless if they are "inconsequential to the ultimate nondisability determination").

To the extent that Plaintiff contends that the ALJ erred in failing to consider the 2018 opinion that Plaintiff "has pain in her lower extremity limits with walking and standing" (AR 3150), (JS at 21), Plaintiff has failed to allege how the ALJ should have considered that opinion or how the ALJ's consideration of that opinion would have affected the ALJ's evaluation. Dr. Hnat did not provide specific walking and standing limitations. In addition, as noted above, the date and language of this opinion would make it irrelevant to the disability determination for the relevant period.

Finally, Plaintiff challenges the ALJ's finding that Dr. Hnat's 2020 opinion was inconsistent with Plaintiff's reported exercise from July 2012 to October 2014 (AR 2472). (JS at 22, 30). This argument has already been addressed and rejected in the above section concerning Plaintiff's subjective symptom testimony. Moreover, the timing and language of the 2020 opinion, like the 2018 opinion, would make the 2020 opinion irrelevant.

### d.    Dr. Dorsey

Plaintiff contends that the ALJ failed to discuss or consider Dr. Dorsey's

opinions, give them retrospective application, or articulate that they were rejected as not relating to the relevant time period.  (JS at 30-33, 36-37.)

"An ALJ 'need not discuss *all* evidence presented to her.  Rather, [an ALJ] must explain why significant probative evidence has been rejected.'"  Kilpatrick v. Kijakazi, 35 F.4th 1187 (9th Cir. 2022) (quoting Vincent ex rel. Vincent v. Heckler, 739 F.2d 1393, 1394–95 (9th Cir. 1984)).  An "ALJ can properly disregard an opinion when it was made so far after the plaintiff's last date of insurance that it lacks probative value."  Bogart v. Comm'r of Soc. Sec., 2020 WL 5535402, at *5 (E.D. Cal. Sep. 15, 2020) (citing Lombardo v. Schweiker, 749 F.2d 565, 567 (9th Cir. 1984)).

Here, Dr. Dorsey's entire treating relationship with Plaintiff occurred after the relevant period.  AR 2455, 3151-68.  Dr. Dorsey opined that her condition did not stabilize until September 2018, about nine months after her LDI.  AR  3164.  Dr. Dorsey wrote his opinions about her work restrictions in the present tense.  AR 3166-67.  Since Dr. Dorsey's post-LDI opinions were too remote to be entitled to probative weight, the ALJ was not required to discuss them.

### e.   Dr. Sharma

Plaintiff argues that the ALJ erred by failing to consider Dr. Sharma's opinion that Plaintiff was precluded from "repetitive use of the hand for pushing, pulling, gripping, or data entry work" (AR 990).   (JS at 51.)  Defendant counters that any error was harmless because there is no conflict between Dr. Sharma's work restrictions and the RFC assessed by the ALJ.  (JS at 52-53.)  Plaintiff responds that the RFC's restriction to "frequent" handling is less conservative than Dr. Sharma's restriction against "repetitive" handling, which, according to Plaintiff, is defined as not exceeding more than 50% of the workday.  (JS at 53-54.)

If Plaintiff's definition of "repetitive" is accepted, occasional handling

would be more restrictive than repetitive handling.  Here, Plaintiff has failed to show that Dr. Sharma's restriction against "repetitive" handling was inconsistent with the RFC's restriction to "frequent" handling.  See Stark v. Astrue, 462 Fed. Appx. 756, 756 (9th Cir. 2011) ("The ability to engage in frequent reaching and handling is not clearly inconsistent with the inability to engage in excessive or repetitive use of the hands.").  At the March 2021 hearing, VE Matildy testified that there were approximately 58,000 jobs a person with Plaintiff's RFC could do even if restricted to occasional reaching and handling.  AR 52, 54.  In October 2018, the Appeals Council found that the requirement of occasional reaching and handling in those two jobs was consistent with the ALJ's 2018 RFC determination of occasional reaching and handling (AR 22).  AR 5 ("The Appeals Council acknowledges that according to the DOT, these two jobs require occasional reaching, handling and fingering, and are consistent with the [RFC] found the by [ALJ].").  Therefore, any error on the ALJ's part to consider Dr. Sharma's "repetitive" handling restriction is harmless.

**C.    ISSUE SIX-A: RFC Findings Concerning Upper Extremities.**

**1.    Relevant Evidence and Administrative Proceedings.**

In October 2018, when reviewing the adverse ALJ decision dated November 17, 2017 (AR 2502-11), the Appeals Council found that the ALJ had erred by assessing an RFC for "occasional" reaching and handling but finding that Plaintiff could do work requiring "frequent" reaching and handling.  AR 5.  The Appeals Council addressed this by noting that the VE had testified that a person with Plaintiff's RFC limited to occasional reaching and handling could work as a counter clerk (DOT 249.366-010[33]) or conveyor line bakery worker (DOT 524.687-022).  AR 5; see AR 53-54.  Based on Plaintiff's ability to do these jobs,

---

[33] The Appeals Council decision refers to  DOT code 239.366-010, which is a typographical error.  The VE used the correct DOT code.  AR 54.

the Appeals Council concluded that Plaintiff was not disabled from June 1, 2012, through November 17, 2017.  AR 5-6.  In arriving at this conclusion, the Appeals Council adopted the RFC determined by the ALJ, including that Plaintiff could do "occasional bilateral reaching overhead and all other directions."  AR 6  [finding #3]; AR 2506 [ALJ's 2017 RFC findings].

ALJ Joseph Lisiecki wrote both the November 17, 2017 decision and the April 26, 2021 decision which finds Plaintiff could "frequently reach overhead, reach in all other directions, handle, finger, feel and push/pull with the upper bilateral extremities."  AR 2459.  In the context of social security disability claims, "occasionally" means up to one-third of the time, while "frequently" means up to two-thirds of the time.  SSR 83-10.

## 2.    Analysis of Claimed Error.

Plaintiff contends that the ALJ, when writing the 2021 decision, was bound by the Appeals Council's 2018 finding that Plaintiff could only engage in occasional reaching and handling.  Alternatively, Plaintiff contends that the ALJ was permitted to make a different finding, but only if the ALJ explicitly explained why.  (JS at 50-51, 53.)

Plaintiff fails to cite any law in support of this apparent res judicata argument.  An ALJ can revisit RFC findings when presented with new and material information, as the ALJ did in 2021 based on new medical evidence submitted after the prior decision..  See Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1173 (9th Cir. 2008); Alekseyevets v. Colvin, 524 Fed. Appx. 341, 344 (9th Cir. 2013) ("[T]he ALJ did not err by considering new medical information and revising Appellant's RFC based on recent medical evaluations and results.").

To the extent that Plaintiff may be arguing that the ALJ's finding that Plaintiff can engage in frequent reaching and handling is not supported by substantial evidence, Plaintiff fails to show that the evidence did not support the

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ALJ's assessment of frequent (rather than occasional) reaching and handling, and Plaintiff appears to concede that any error in the ALJ's assessment of frequent reaching and handling would be harmless.  (JS at 51 [stating that the issue is "moot" if Plaintiff can perform the exertional requirements of light work].)

**IV.**

**CONCLUSION**

For the reasons stated above, IT IS ORDERED that Judgment shall be entered AFFIRMING the decision of the Commissioner denying benefits.

DATED:  December 07, 2022

_Karen E. Scott_

KAREN E. SCOTT
United States Magistrate Judge